UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


GREGORY E. SOUTHWARD,

       Petitioner,

                                     CASE NO. 2:08-CV-10398

  v.                               JUDGE GEORGE CARAM STEEH

                                     MAGISTRATE JUDGE PAUL J. KOMIVES

MILLICENT WARREN,

       Respondent.

_____/


**REPORT AND RECOMMENDATION**

I.     RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
II.    REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
     A.    *Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
     B.    *Factual Background Underlying Petitioner's Conviction* . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
     C.    *Standard of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
     D.    *Evidentiary Claims (Claims III, IV, and IX)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
          1.    *Evidence Claims Generally* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
          2.    *Rape Shield Evidence (Claims III & IV)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
               a.  Clearly Established Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
               b.  Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
          3.    *Expert Witness (Claim IX)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
     E.    *Sentencing Claims (Claims V & VI)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
          1.    *Sentencing on Felony Firearm (Claim V)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
          2.    *Habitual Offender Sentence (Claim VI)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
     F.    *Discovery Claim (Claim VII)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
          1.    *Violation of Discovery Rules* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
          2.    *Suppression of Exculpatory Evidence* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
               a.  Clearly Established Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
               b.  Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
     G.    *Jury Selection Claim (Claim X)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
     H.    *Ineffective Assistance of Counsel (Claims I, II, VIII, & XI)* . . . . . . . . . . . . . . . . . . . . . . . 36
          1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
          2.    *Trial Counsel (Claims I & VIII)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
               a.  Failure to Introduce Letter and Jail Visits . . . . . . . . . . . . . . . . . . . . . . . . . . 37
               b.  Failure to Challenge Juror . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
               c.  Failure to Seek Suppression of Evidence from Petitioner's Car . . . . . . . . . . . . 44
               d.  Failure to Seek Suppression of Late Disclosed Evidence . . . . . . . . . . . . . . . . 47
          3.    *Appellate Counsel (Claims II & XI)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
               a.  Lack of Evidentiary Hearing (Claim II) . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
               b.  Failure to Raise Claims on Appeal (Claim XI) . . . . . . . . . . . . . . . . . . . . . . . 49
     I.    *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
III.   NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

I.      <u>RECOMMENDATION</u>: The Court should deny petitioner's application for the writ of habeas corpus.

II.     <u>REPORT</u>:

A.      *Procedural History*

1.      Petitioner Gregory E. Southward is a state prisoner, currently confined at the Thumb Correctional Facility in Lapeer, Michigan.

2.      On March 21, 2003, petitioner was convicted of carrying a dangerous weapon with unlawful intent, MICH. COMP. LAWS § 750.226; two counts of assault with a dangerous weapon, MICH. COMP. LAWS § 750.82; first degree home invasion, MICH. COMP. LAWS § 750.110a(2); kidnapping, MICH. COMP. LAWS § 750.349; five counts of first degree criminal sexual conduct, MICH. COMP. LAWS § 750.520b; and possessing a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b, following a jury trial in the Saginaw County Circuit Court.  On May 29, 2003, he was sentenced as a second habitual offender, MICH. COMP. LAWS § 769.10, to concurrent terms of 2-7½  years' imprisonment on the dangerous weapon conviction, 2-6 years' imprisonment on each assault conviction, 14-30 years' imprisonment on the home invasion conviction, 20-50 years' imprisonment on the kidnapping conviction, and 29-50 years' imprisonment on each criminal sexual conduct conviction, all consecutive to a mandatory term of two years' imprisonment on the felony-firearm conviction.

3.      Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

I.      DEFENDANT'S STATE AND FEDERAL CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL (US CONST AMEND VI; CONST 1963, ART I, § 20) WERE VIOLATED WHERE TRIAL COUNSEL, WITH NO STRATEGIC PURPOSE, MADE THREE OUTCOME DETERMINATIVE ERRORS: (1) HE DID NOT KNOW THAT POST-

2

ARREST LOVE-LETTERS COMPLAINANT WROTE WERE ADMISSIBLE AND THEREBY BADLY ADVISED DEFENDANT; (2) HE NEVER ATTEMPTED TO SHOW THE JURY THAT COMPLAINANT WAS VISITING DEFENDANT IN THE COUNTY JAIL; AND (3) HE FAILED TO CHALLENGE OR EXCUSE A JUROR WHO HERSELF EXPRESSED CONCERN THAT SHE WAS BIASED. THE TRIAL COURT THEN ERRED IN DENYING DEFENDANT'S POST-CONVICTION REQUEST FOR A <u>GINTHER</u> HEARING.

II.     FAILURE TO GRANT REMAND FOR AN EVIDENTIARY HEARING WILL RESULT IN DENIAL OF EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL GUARANTEED BY THE FEDERAL AND STATE CONSTITUTIONS (U.S. CONST. AMEND. VI; CONST 1963, ART 1, SEC. 20).

III.     DESPITE THE PLAIN LANGUAGE OF THE RAPE-SHIELD LAWS THAT THEY DO NOT APPLY TO EVIDENCE INVOLVING PRIOR SEX ACTS BETWEEN COMPLAINANT AND DEFENDANT, THE COURT COMMITTED REVERSIBLE ERROR BY INTERPRETING THE RAPE-SHIELD LAWS TO PROHIBIT DEFENDANT FROM INTRODUCING EVIDENCE OF PRIOR CONSENSUAL 'ROUGH SEX,' OR ORAL OR ANAL SEX, BETWEEN COMPLAINANT AND DEFENDANT.

IV.     THE TRIAL JUDGE VIOLATED DEFENDANT'S CONSTITUTIONAL RIGHTS TO A FAIR TRIAL, TO CONFRONT THE COMPLAINANT, AND TO PRESENT A DEFENSE BY SUPPRESSING MATERIAL AND RELEVANT EVIDENCE OF ROUGH SEX, OR ORAL AND ANAL SEX, BETWEEN HE AND COMPLAINANT.

V.     THE TRIAL COURT LACKED AUTHORITY TO MAKE DEFENDANT'S FELONY FIREARM SENTENCE RUN CONSECUTIVE TO EVERY CHARGED FELONY. BECAUSE THE JURY WAS MISINSTRUCTED, IT MADE NO SPECIFIC FINDING THAT DEFENDANT POSSESSED A FIREARM DURING EACH OF THOSE FELONIES.

VI.     DEFENDANT WAS ERRONEOUSLY SENTENCED AS AN HABITUAL OFFENDER SECOND. AN HABITUAL OFFENDER CONVICTION CANNOT BE PREDICATED ON A PRIOR OUT-OF-STATE MISDEMEANOR OFFENSE, UNLESS THE PROSECUTOR SHOWS THAT THE PRIOR OFFENSE WOULD SUPPORT A FELONY CONVICTION IN MICHIGAN. <u>PEOPLE V. QUINTANILLA</u>, 225 Mich App 477 (1997). DEFENDANT'S SENTENCES EXCEEDED THE GUIDELINES WITH NO REASON FOR DEPARTURE STATED.

Petitioner also filed a *pro se* supplemental brief, raising three additional claims of error in support of

his appeal:

> VII.  THE PROSECUTION VIOLATED DISCOVERY UNDER MCR 6.201(A)(6), AND MCR 6.201(B)(1), IN DISCLOSING THE ALLEGED VICTIM'S PANTIES, THUS DENYING DEFENDANT HIS CONSTITUTIONAL PROTECTIONS FIFTH [sic] AND FOURTEENTH AMENDMENT

> VIII.  TRIAL COUNSEL WILLIAM D. WHITE FAILED TO FILE A MOTION TO SUPPRESS THE ALLEGE[D] VICTIM'S PANTIES, DEPRIVING DEFENDANT OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL.

>> B.  TRIAL COUNSEL WILLIAM WHITE FAILED TO FILE A MOTION TO SUPPRESS THE GENERAL INFORMATION IN THE ASSAULT VICTIM MEDICAL REPORT OF INFORMATION AND EVIDENCE FORM, IN VIOLATION OF DEFENDANT'S SIXTH AND FOURTEENTH AMENDMENT RIGHTS.

>> C.  TRIAL COUNSEL WILLIAM D. WHITE FAILED TO FILE A MOTION TO SUPPRESS THE TAINED [sic] ILLEGAL SEARCH AND SEIZURE OF DEFENDANT'S VEHICLE, IN VIOLATION OF DEFENDANT'S FOURTH AND SIXTH AMENDMENT RIGHTS.

> IX.  THE TRIAL COURT ABUSED ITS DISCRETION IN ALLOWING DETECTIVE JOSEPH GRIGG TO TESTIFY AS AN EXPERT WITNESS, AND A SUMMARY WITNESS FOR THE PROSECUTION, THUS BOLSTERING HIS TESTIMONY, AND PREJUDICING DEFENDANT.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence. *See People v. Southward*, No. 249293 (Mich. Ct. App. Dec. 28, 2004) (per curiam) [hereinafter "Ct. App. op."].[1]

   4.    Petitioner, proceeding *pro se*, sought leave to appeal these issues to the Michigan Supreme Court. The Supreme Court denied petitioner's application for leave to appeal in a standard order. *See People v. Southward*, 472 Mich. 895, 695 N.W.2d 75 (2005).

   5.    Petitioner subsequently filed a motion for relief from judgment in the trial court

---

[1]The court of appeals initially issued its decision on August 19, 2004. That decision was vacated and the December 28, 2004, opinion issued in its place.

4

pursuant to MICH. CT. R. 6.500-.508, raising the following claims:

    I.      DEFENDANT WAS DENIED DUE PROCESS OF LAW WHEN THE PROSECUTION FAILED TO DISCLOSE HIGHLY RELEVANT EVIDENCE, VIOLATION MCR 6.201(B)(1) AND MCR 6.201(F), THUS DENYING DEFENDANT'S STATE AND FEDERAL CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL. (US CONST. AMEND. VI; CONST. 1963, ART. 1, SEC 20).

    II.     DEFENDANT CLAIMS THAT HIS CONVICTION WAS OBTAINED BY TRIAL COURT ABUSE OF DISCRETION IN THE METHOD USED TO SELECT AND IMPANEL THE JURY WAS UNCONSTITUTIONAL AND VIOLATED THE JURY SELECTION AND SERVICE ACT OF 1968, THUS VIOLATING THE DEFENDANT'S DUE PROCESS RIGHTS TO A FAIR TRIAL.

    III.    DEFENDANT WAS DENIED THE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL WHERE HIS APPELLATE ATTORNEY DID NOT RAISE THE ABOVE ISSUES IN DEFENDANT'S APPEAL BY RIGHT AND ABANDON[ED] HIS CASE BEFORE A FINAL OPINION, LEAVING DEFENDANT WITHOUT COUNSEL.

    IV.    TRIAL COURT ABUSE OF DISCRETION FOR NOT RESOLVING INACCURATE INFORMATION AND PROSECUTION ABUSE OF DISCRETION ON CHARGING OFFENSE WHICH DEFENDANT WAS NEVER CONVICTED OF. DUE PROCESS REQUIRES SENTENCING INFORMATION TO BE ACCURATE, TOWNSEND V BURKE, 224 US 736; 68 S.CT. 1252; 92 LE 2D 1960 (1948).

On June 29, 2006, the trial court denied petitioner's motion for relief from judgment based on his failure to establish good cause for his failure to raise the claims on direct appeal as required by MICH. CT. R. 6.508(D)(3). *See People v. Southward*, No. 02-022451-FC-5 (Saginaw County, Mich., Cir. Ct. June 29, 2006). The Michigan Court of Appeals and Michigan Supreme Court denied petitioner's applications for leave to appeal in standard orders, based on petitioner's "failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Southward*, 480 Mich. 925, 740 N.W.2d 289 (2007); *People v. Southward*, No. 272444 (Mich. Ct. App. Apr. 19, 2007).

    6.    Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus

on January 28, 2008.  As grounds for the writ of habeas corpus, he raises the nine issues that he raised

on direct appeal, as well as the jury selection and ineffective assistance of appellate counsel claims

he raised in his post-conviction motion.  Petitioner filed an amended brief in support of his petition

on July 21, 2008

       7.      Respondent filed her answer on August 29, 2008.  She contends that petitioner's jury

selection claim is barred by petitioner's procedural default in the state courts, and that the remaining

claims are without merit or not cognizable on habeas review.

       8.      Petitioner filed a reply to respondent's answer on October 10, 2008.

B.    *Factual Background Underlying Petitioner's Conviction*

       Petitioner's conviction arises from the abduction and sexual assault of his former wife.  The

evidence adduced at trial was accurately summarized in the prosecutor's brief in the Michigan Court

of Appeals:

> In June of 2002, Matthew Miller dated the victim, Shelley Taylor. (TT2 37-38) Matthew spent the June 15-16 weekend with Shelley at her house. (TT2 38) Early Sunday morning, Defendant called repeatedly between the hours of 3 and 5 am (TT2 39-40) Matthew answered the call. Defendant wanted to speak with Shelley, but Matthew told him she was sleeping. Defendant was persistent. So, Matthew woke up Shelley. She was upset by the fact that Defendant was calling so early in the morning. Defendant called again at 5:30 a.m. Defendant sounded more hostile. He again spoke with Shelley. (TT2 41) Some time in the morning, Defendant arrived to retrieve some of his belongings. Defendant and Shelly exchanged some things and briefly conversed. (TT2 42) Defendant called again mid-morning, wishing to speak with Shelley. Matthew told him that Shelley was busy and that he should not call because they were preparing to go to a graduation party. In response, Defendant threatened Matthew, telling Matthew that he did not want him to come over to Shelley's. Matthew told him that he was not going to allow Defendant to come into the house to harm anyone. (TT2 43)
>
> Matthew and Shelley left her house for three hours to attend the party. (TT2 43-44) They returned to Shelley's home around 4 p.m. Shelly was tired. She went into her bedroom to take a nap. Matthew went into the living room to watch TV. While watching TV, Matthew heard a knock at the side door. It was Defendant. (TT2 44) Matthew answered the door. Defendant asked to speak with Shelley. Without opening the door, Matthew told him that Shelley was sleeping. Matthew then turned around

and walked away from the door. (TT2 46, 49)

This side entrance had two doors. The main door had nine glass panels. The other door was a screen door. Both doors were initially undamaged. (TT2 47) While Matthew walked back to the living room, Shelley asked him who was at the door. He told her it was Defendant. (TT2 49) Matthew sat back down to resume watching TV. Matthew then heard glass breaking from the side door. He got up and ran towards the sound. Matthew grabbed the doorknob. He saw that the screen door was open and that Defendant was holding it open with his left hand. Matthew saw that some of the glass panels were broken. (TT2 50) Matthew then saw Defendant reach behind with his right hand. Defendant pulled out a gun and pointed it to Matthew's face. The gun was a foot away. Matthew saw that it was a flat-black semi-automatic handgun.

Matthew immediately turned around, ducked down, and ran out of the kitchen and into the living room. Matthew told Shelley that Defendant had a gun. He heard Shelley say, "Oh, my God." (TT2 51, 52-53) Fearing for his life, Matthew ran out of the front door to the other side of the street to call the police. He thought Shelley was right behind him, but he realized that she was not. (TT2 52)

Matthew turned around and heard Shelley screaming. He saw her running down her driveway, yelling for help. (TT2 53) Ten to fifteen feet from the street, Defendant caught Shelley by her hair. Defendant was pulling on Shelley, who was trying to flee. Shelly fell down. Matthew told Defendant to put the gun down. Instead, Defendant pointed the gun at him. Matthew turned around and ran. (TT2 54) Matthew ran to a house and dialed 911. (TT2 54-55) Defendant and Shelley were still in the driveway. Shelley was on the ground, and Defendant was standing directly over her.

Then, Matthew lost sight of them. He assumed that they went back into Shelley's house. (TT2 55) When the police arrived, Matthew told them that Defendant and Shelley were in the house. The police then surrounded the house. (TT2 56)

The next morning, at about 8 a.m., Matthew saw someone drop Shelley off in her driveway. She looked worn out. She was only wearing a t-shirt and shorts. (TT2 57) She was distraught and crying. (TT2 58) She was shaking, and she was so exhausted, that she was leaning on everyone. Shelley said that she was raped repeatedly and that Defendant had held a gun to her head. (TT2 59) Shelley further stated Defendant was going to kill her and himself and that Defendant raped her in the parking lot of Peace Lutheran Church and Arthur Hill High School. (TT2 60)

Jill Pogoreski lived behind Shelley's house. (TT2 79) On June 16, at about 6:10 p.m., she was at home, watching TV. She heard her dog bark and then a car door slam. She looked outside and saw a man exiting a Chevy Blazer. This vehicle was parked across the street. (TT2 80) Jill did not recognize the Blazer from the neighborhood. A black man exited the car and walked to the driveway left of Jill's house. (TT2 82) She then lost sight of him. (TT2 82-83) About ten minutes later, she heard a male voice swearing, coming from the driveway which the man had entered. (TT2 83) The man was with a woman only dressed in a tank top and panties. (TT2 84) She was walking two steps behind the man with her hands to her face. She was crying. Both of them entered the Blazer and left. (TT2 85)

Thirteen-year-old Kimberly Villarreal was rollerblading down Allegan. (TT2 96, 97) She saw Shelley running down Shelley's driveway, screaming. (TT2 97-98)

Kimberly saw a man run across the street, pounding on a door. She then saw a man run behind Shelley. (TT2 99) He appeared to be chasing Shelley. He placed his arm around Shelley's neck. (TT2 100) Shelley was on the ground. The man who ran across the street told the second man to put the gun down. (TT2 101) Kimberly then saw Shelley and the second man in Shelley's backyard. (TT2 102) After seeing this, Kimberly went to tell her father. (TT2 104)

Barbara Ennis lived at 1711 Allegan. Returning home from work between 3 and 4 p.m., she saw an older model red Chevy Blazer backed in the access drive of a school. Barbara did not recognize this vehicle from the neighborhood. (TT2 111, 113) She saw only one person in the car, an African-American male. The car left and returned fifteen minutes later. (TT2 113) The vehicle stayed for thirty minutes and left again between 4 and 5 p.m. (TT2 113-114)

Robin Sauer lived on the corner of Wheeler and Allegan Streets. (TT2 117) She saw a woman seated in a crouched position in a driveway. A man was standing over her. Robin initially thought the woman had fallen and that the man was helping her up, but she saw the woman put her arm up as if to push the man away. The woman was white; the man was black. (TT2 118) Robin heard the sound of either crying or whimpering. (TT2 119) Robin then saw a white man run across Allegan and Wheeler. This same man appeared at Robin's back door, screaming to use her phone to call 911. (TT2 120, 121) Robin then lost sight of the man and the woman who were in the driveway. (TT2 122)

Shelley Taylor was married to Defendant from February of 2001 to June of 2002. (TT2 129) They both lived at 2006 Allegan. (TT2 129-130) They separated around Christmas of 2001. Their divorce was final on June 3, 2002. (TT2 130)

On June 16, Matthew Miller stayed with her. At about 3:30 a.m., Defendant called her. She did not speak with him. At 5:30, Defendant called again. This time, she spoke with Defendant, telling him that she was not alone. This upset Defendant. (TT2 132, 133) Defendant then asked Shelley for the wedding rings back and said that she owed him some money. (TT2 133-134) Defendant always asked for her rings back whenever he was upset with her. (TT2 197) Defendant told her that he was coming over to retrieve the rings. Five to ten minutes later, he arrived. Defendant drove into the driveway and honked his horn. Shelley walked to his car and placed the rings in his red Blazer. Defendant asked if they could talk. Shelley said no. (TT2 134) Shelly returned to bed, and Defendant left. Defendant called again between 6 and 7 a.m., upset. (TT2 135, 136) Defendant told her that he could not believe that she had someone over there. (TT2 135-136) Shelley replied that it was time to move on. After this conversation, Shelley placed the phone off the hook and went back to bed. (TT2 136)

Matthew and Shelley left her house around noon. They returned at about 4:30 p.m. At about 5:00, Shelley took a nap while Matthew watched TV. Before napping, Shelley removed her shorts but left on her t-shirt and underwear. (TT2 137-138) She fell asleep but was awakened by the sound of her doorbell. Matthew answered it. (TT2 138) Shelley asked who was at the door. Matthew said it was Defendant. Shelley laid back down. She then heard a noise at the back door, like the sound of glass breaking. Matthew arose from the couch. (TT2 139) Matthew headed to the back door and then

8

came running through the house. Matthew said Defendant had a gun.

Shelley grabbed the phone and hid in the closet to call 911. (TT2 140) Defendant walked into the room. (TT2 142-143) Shelley heard a click. [Later] Detective Joseph Grigg made a racking noise by sliding a round into the chamber of a handgun. Shelley heard the sound and identified it as the click she heard while in her closet. (TT3 61-62) Defendant told her to hang up the phone and to go with him. (TT2 144-145) So, she got out of the closet and hung up the phone. Defendant then searched the house for Matthew.

While he was looking in the living room, Shelley ran out the back door. (TT2 145) She ran down her driveway but fell near the sidewalk. (TT2 148) Shelley was screaming for help. Defendant was right behind her. She was still dressed in only a t-shirt and underwear. Defendant ordered her to stand up. Shelley placed her hands in front of her face, asking Defendant not to hurt her. (TT2 149) Defendant said, "You can't run from me." He had the gun pointed to her face. (TT2 150) Shelley heard Matthew telling Defendant to leave her alone and to put the gun down. (TT2 151) Defendant stepped back from Shelley and told Matthew, "I have something for you."

Defendant turned back to Shelley and ordered her to leave. She and Defendant then walked into the backyard. (TT2 152) Shelley followed him because she was afraid that he would shoot her. (TT2 156-157) A fence divided Shelley's backyard from the property behind her house. (TT2 153) Defendant first jumped over the fence and then ordered Shelley to follow him. Shelley climbed it while Defendant pulled her over it. (TT2 153-154) Both of them cut through a driveway and walked to Defendant's car, which was parked on the street. (TT2 154) Shelley was pleading with Defendant, saying, "Please, please don't. What do you want? What are we doing? Where are we going?" Defendant answered her by ordering her into his car. (TT2 155)

Once in the car, Defendant screamed, "You screwed up, Shelley. I'm back." As he was driving, Defendant pointed the gun at her. (TT2 157) Defendant told Shelley that they could have worked it out. (TT2 157-158) Defendant drove to Peace Lutheran Church. Driving there, Defendant told Shelley that he loved her and that he knew she loved him. Shelley only whimpered. (TT2 158)

Defendant had the gun pointed to her pubic area. Defendant said "it" was his and that he wanted to see "it". Shelley pulled her underwear down. Defendant then told her to take her underwear off. (TT2 159) Shelley refused. Defendant reached over and pulled her underwear off. He took them off and threw them out of the window. (TT2 160)

Once at the church parking lot, Defendant backed his car into the Arthur Hill High School parking lot. He parked the car in an area which was secluded from the street. (TT2 161) Defendant told Shelley that he had been waiting for her. He got on top of her, saying, "I'm going to fuck you." (TT2 162) Defendant then placed his penis in her vagina. (TT2 164) Defendant flipped Shelley over and attempted to penetrate her anally. He was partially successful, but when Shelley started screaming, Defendant stopped. (TT2 165) Defendant then forced Shelley to suck his penis. After this, he flipped her over again and fully penetrated her anally. Shelley screamed. Defendant pushed her head down to fully penetrate her. (TT2 166)

Defendant and Shelley then moved to the back of the Blazer. (TT2 166-167)

Defendant laid the seats down so that both of them could fit in the back. Both of them laid down. Defendant told her that he was going to release her at 8:10 p.m. At 8:10, Shelley asked if she could go. (TT2 167) Defendant refused, telling her that she should know him better than that. (TT2 167-168) Defendant penetrated her again vaginally. (TT2 168) Shelley did not initiate any of the sexual contact with Defendant, and she did not want to have sex with Defendant. (TT2 188, 204-205) He said that she was going to watch him kill himself because she broke his heart. (TT2 168)

Defendant kept her in the parking lot until 6 a.m. the next morning. Shelley asked Defendant if he could release her. However, they could not leave because the car's battery had died. (TT2 169) David Elizalde arrived to work at Arthur Hill High School. (TT2 210) Defendant asked him for a jump. (TT2 211, 212) Once the car was jumped, Defendant drove Shelley to his mother's house. (TT2 170)

There, his mother told him that people were looking for him. (TT2 171) Defendant's mother and step-father then drove Defendant to jail so that he could turn himself in. From there, they drove Shelley home. (TT2 172) Officer Christine Chambers arrived at Shelley's home to take Shelley to the hospital. (TT3 36) Shelley was upset, crying. (TT3 37) At the hospital, Shelley was visibly shaken, crying intermittently. (TT3 39)

Pl.-Appellee's Br. on App., in *People v. Southward*, No. 249293 (Mich. Ct. App.), at 1-10.

Petitioner testified to a somewhat different version of events. As summarized in his brief on direct appeal:

Defendant testified as follows. He was thirty-nine years of age. He was employed with the 7-Up Company before these charges were filed. He married Shelly Taylor on February 7, 2001. The marriage was normal until a miscarriage "took its toll." Taylor filed for divorce. He moved out Christmas Day 2001. (TT III 74-77). They continued to see each other. On the day their divorce was final, they met afterwards for cocktails. They did the same a week later, at the place they had first met. He understood they were simply friends. They talked on the phone almost every day. She never indicated that she did not wish to talk to him "even till the present day" he testified. (TT III 77-80).

The Sunday in question, Defendant got upset when he learned that Taylor had been with another man. He demanded that she return rings he had given her. He went over to her home. They talked outside. She gave him the rings. She told him Miller was in the house. He returned at around 6:00 PM, to give her the rings back. He still though[t] he could win back her heart. (TT III 80-82). He parked on the street over, he said, because he did not want her to know that he was drinking and driving. Miller answered the door. Miller looked out at him through a glass door-pane. Miller would not bring Taylor to the door. (TT III 82-83).

Defendant testified that he broke the door. Miller fled. Defendant then kicked the door open. He considered the home to be his legal residence. He found Taylor in her bedroom and asked her to talk. Distracted while searching for Miller, Taylor fled

in her underwear. He pursued her. (TT III 84-87).

According to defendant, Taylor then decided to go with him. He never had his hand on her. They jumped a neighbor's fence. He did not assist her. She got into the passenger side of his Blazer willingly. He did nothing to keep her a prisoner. He had no gun. He only wished to tell her how much he loved her, to try to win her back. (TT III 87-91). While driving, he seemed to appreciate that she was afraid, when he suggested that she throw her underwear out the window and she complied. He wanted to calm her down, let her know that he only wished to talk. (TT III 94-96).

He took her to the their church. They talked calmly for 30 minutes. She kissed him and signaled that she wanted sex. He did not want to have sex in front of the Church, so he went to the adjacent grounds of Arthur Hill High School. When he got there, it was still daylight out and people were around. The Blazer had tinted windows. Twenty minutes after arriving, Taylor initiated the sex. The two then slept. When he awoke, he realized that his car batter was dead. They talked about the child they lost and their marriage.

According to Defendant, all of the sex was consensual. (TT III 93-100). He subsequently turned himself in to police. He thought he was in trouble over the damaged door, back at Taylor's home. (TT III 102). She never resisted the sex or indicated it was not consensual. At one point, she said the anal sex was hurting. But then she put him back inside herself. (TT III 103).

Def.-Appellant's Br. on Appeal, in *People v. Southward*, No. 249293 (Mich. Ct. App.), at 8-10.

C.      *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the

provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-

132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst

other amendments, the AEDPA amended the substantive standards for granting habeas relief by

providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v.*

*Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp. 2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.      *Evidentiary Claims (Claims III, IV, and IX)*

Petitioner first raises several evidentiary claims. In Claim III, petitioner contends that the trial court erred in interpreting Michigan's rape-shield statute to preclude evidence of prior sexual conduct between he and the victim. In Claim IV, petitioner contends that this ruling violated his right to present a defense and to confront the victim. Finally, in Claim IX, petitioner contends that the trial court erred in allowing a police witness to testify as an expert witness. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.      *Evidence Claims Generally*

It is well established that habeas corpus is not available to remedy a state court's error in the application of state law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Jackson v. Ylst*, 921 F.2d 882, 885 (9th Cir. 1990) (a federal court on habeas review

13

"ha[s] no authority to review a state's application of its own laws). Thus, unless a violation of a state's evidentiary rule results in the denial of fundamental fairness, an issue concerning the admissibility of evidence does not rise to the level of a constitutional magnitude. *See Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *Davis v. Jabe*, 824 F.2d 483, 487 (6th Cir. 1987). "[A] federal habeas court has nothing whatsoever to do with reviewing a state court ruling on the admissibility of evidence under state law. State evidentiary law simply has no effect on [a court's] review of the constitutionality of a trial, unless it is asserted that the state law itself violates the Constitution." *Pemberton v. Collins*, 991 F.2d 1218, 1223 (5th Cir. 1993). As the Sixth Circuit has noted, "[e]rrors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial." *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir. 1994).

In short, "[o]nly when the evidentiary ruling impinges on a specific constitutional protection or is so prejudicial that it amounts to a denial of due process may a federal court grant a habeas corpus remedy." *Barrett v. Acevedo*, 169 F.3d 1155, 1163 (8th Cir. 1999); *see also*, *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001). Where a specific constitutional right–such as the right to confront witnesses or to present a defense–is not implicated, federal habeas relief is available only if the allegedly erroneously admitted evidence "is almost totally unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings." *Barefoot v. Estelle*, 463 U.S. 880, 899 (1983).

2.      *Rape Shield Evidence (Claims III & IV)*

Petitioner first challenges the trial court's refusal to allow him to introduce evidence that, during her marriage to petitioner, the victim had engaged in consensual sex acts similar to those she alleged that petitioner had forced her to perform. Petitioner contends that, in addition to constituting

14

an erroneous application of the rape-shield statute, this determination violated his right to confront

the victim and to present a defense.  The Court should conclude that petitioner is not entitled to habeas

relief on this claim.

### a.  Clearly Established Law

In addition to attacking the state courts' interpretation of the Michigan rape-shield statute,

petitioner contends that the trial court's ruling denied him the right to confront the victim and present

a defense.  The Sixth Amendment provides, in relevant part: "In all criminal prosecutions, the accused

shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. CONST. amend. VI.

The Confrontation Clause is applicable to the states through the 14th Amendment's Due Process

Clause.  *Pointer v. Texas*, 480 U.S. 400, 406 (1965).  The Supreme Court's "Confrontation Clause

cases fall into two broad categories:  cases involving the admission of out-of-court statements and

cases involving restrictions imposed by law or by the trial court on the scope of cross-examination."

*Delaware v. Fensterer*, 474 U.S. 15, 18 (1985) (per curiam).  Petitioner's habeas claim raises the latter

type of challenge.  The latter category of Confrontation Clauses cases recognizes that "[c]onfrontation

means more than being allowed to confront the witness physically."  *Davis v. Alaska*, 415 U.S. 308,

315 (1974).  Thus, in cases where the trial court has restricted cross-examination in some manner, "the

Court has recognized that Confrontation Clause questions will arise because such restrictions may

'effectively . . . emasculate the right of cross-examination itself.'"  *Fensterer*, 474 U.S. at 19 (quoting

*Smith v. Illinois*, 390 U.S. 129, 131 (1968)).  However, the Supreme Court has also explained that the

Confrontation Clause does not "guarantee cross-examination that is effective in whatever way and

to whatever extent the defense might wish."  *Fensterer*, 474 U.S. at 20.  The question is whether the

trial court's ruling allowed for "substantial compliance with the purposes behind the confrontation

requirement," or, put another way, whether petitioner was "significantly limited in any way in the

15

scope or nature of his cross-examination." *California v. Green*, 399 U.S. 149, 166 (1970).  Thus,

"[s]o long as cross-examination elicits adequate information to allow a jury to assess a witness's

credibility, motives, or possible bias, the Sixth Amendment is not compromised by a limitation on

cross-examination." *United States v. Cueto*, 151 F.3d 620, 638 (7th Cir. 1998); *see also*, *United States*

*v. Larranaga*, 787 F.2d 489, 498 (10th Cir. 1986).

Although the Constitution does not explicitly provide a criminal defendant with the right to

"present a defense," the Sixth Amendment provides a defendant with the right to process to obtain

witnesses in his favor and to confront the witnesses against him, and the Fourteenth Amendment

guarantees a defendant due process of law.  Implicit in these provisions is the right to present a

meaningful defense.  As the Supreme Court has recognized, "[t]he right to offer the testimony of

witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a

defense." *Washington v. Texas*, 388 U.S. 14, 19 (1967).  "The right to compel a witness' presence

in the courtroom could not protect the integrity of the adversary process if it did not embrace the right

to have the witness' testimony heard by the trier of fact.  The right to offer testimony is thus grounded

in the Sixth Amendment." *Taylor v. Illinois*, 484 U.S. 400, 409 (1988).  Further, the Court has noted

that "[t]his right is a fundamental element of due process of law," *Washington*, 388 U.S. at 19, and

that "[f]ew rights are more fundamental[.]" *Taylor*, 484 U.S. at 408.  Although the right to present a

defense is fundamental, it is not absolute.  Thus, the right must yield to other constitutional rights, *see*

*e.g.*, *United States v. Trejo-Zambrano*, 582 F.2d 460, 464 (9th Cir. 1978) ("The Sixth Amendment

right of an accused to compulsory process to secure attendance of a witness does not include the

right to compel the witness to waive his Fifth Amendment privilege."), or to other legitimate

demands of the criminal justice system, *see United States v. Scheffer*, 523 U.S. 303, 308 (1998).

Further, to constitute a denial of the right to present a defense, a trial court's exclusion of

evidence must "infringe[] upon a weighty interest of the accused." *Scheffer*, 523 U.S. at 308. A "weighty interest of the accused" is infringed where "the exclusion of evidence seriously undermined 'fundamental elements of the defendant's defense' against the crime charged." *Miskel v. Karnes*, 397 F.3d 446, 455 (6th Cir. 2005) (quoting *Scheffer*, 523 U.S. at 315). Thus, "'[w]hether the exclusion of [witnesses'] testimony violated [defendant's] right to present a defense depends upon whether the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist.'" *United States v. Blackwell*, 459 F.3d 739, 753 (6th Cir. 2006) (quoting *Washington v. Schriver*, 255 F.3d 45, 47 (2d Cir. 2001)) (alterations by quoting court).

### b. Analysis

"Like most States, Michigan has a 'rape-shield' statute designed to protect victims of rape from being exposed at trial to harassing or irrelevant questions concerning their past sexual behavior." *Michigan v. Lucas*, 500 U.S. 145, 146 (1991). Michigan's rape shield law provides:

> Evidence of specific instances of the victim's sexual conduct, opinion evidence of the victim's sexual conduct, and reputation evidence of the victim's sexual conduct shall not be admitted under sections 520b to 520g [the sexual conduct offense provisions] unless and only to the extent that the judge finds that the following proposed evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value:
> (a) evidence of the victim's past sexual conduct with the actor;
> (b) evidence of specific instances of sexual activity showing the source or origin of semen, pregnancy, or disease.

MICH. COMP. LAWS § 750.520j(1). The statute further provides that, if a defendant seeks to introduce evidence under (a) or (b), he must give notice of his intent to do so within ten days of the arraignment. *See id.* § 750.520j(2). Even where evidence falls within (a) or (b), the defendant must show that the evidence is "material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value." *Id.* § 750.520j(1); *see also*, *People v. Adair*, 452 Mich. 473, 481-82, 550 N.W.2d 505, 509-10 (1996). In such a case, "the focus shifts to materiality and balancing

probative value against prejudice." *Id.* at 482, 550 N.W.2d at 510.

In petitioner's case, on the first day of trial, counsel informed the court that he was seeking to introduce evidence that, during their marriage, petitioner and the victim had engaged in "rough" sex and anal sex, in order to show that she had consented to the sex acts alleged to have been performed by petitioner. *See* Trial Tr., Vol. I, at 5-7. The prosecutor responded that the evidence was inadmissible under the rape-shield statute because it was irrelevant to the issue of consent, and the prejudicial effect of the evidence outweighed its probative value. *See id.* at 7-9. The trial court reserved ruling on the matter at that time. The following day, the trial court denied defense counsel's request to allow this evidence. The court reasoned that because evidence would be presented that the victim and petitioner were married and presumably that evidence they had engaged in consensual sex would also be admitted, the particular acts were not relevant to the issue of consent. *See* Trial Tr., Vol. II, at 127. The Michigan Court of Appeals affirmed this decision, reasoning that "[t]he fact that while married to defendant, the victim willingly engaged in sexual acts similar to those giving rise to this case, has no bearing on whether she consented to engage in such acts after the marriage had ended." Ct. App. op. at 4.

The Court should conclude that this determination was reasonable. The fact that the acts perpetrated by petitioner were similar to acts to which the victim had consented when they were married did not go to whether she had consented on the date of the assault. This was not a case in which the victim and the prosecution claimed that the nature of the sex acts themselves demonstrated a lack of consent, or that she had consented to some sexual acts with petitioner but not the acts he actually performed. In such a case, evidence that she had previously engaged in those types of acts with petitioner may be relevant. Here, however, the victim simply denied consenting to any form of sexual activity with petitioner. The jury was well aware that as husband and wife petitioner and the

18

victim had been sexually intimate.  In these circumstances, the specific types of sexual acts which the two had consensually engaged in while married was irrelevant to the issue of the victim's consent at the time of the assault.  *See Adair*, 452 Mich. at 489, 550 N.W.2d at 512.  And introducing such irrelevant evidence would have done nothing except expose the victim to the "further and more exacting embarrassment" which the rape-shield statute is designed to avoid.  *State v. Higgins*, 821 A.2d 964, 971 (N.H. 2003).  As the *Higgins* court persuasively explained:

> [I]ntroducing evidence of a victim's past sexual conduct presents a great danger of offending and inflaming those jurors who may find such conduct alien to their own experience and contrary to their morals.  Especially where the prior conduct involves consent to deviant activity, offender jurors may be unable to comprehend how such a person could be raped.

*Id.* at 972 (citations omitted); *see also*, *United States v. Ramone*, 218 F.3d 1229, 1238 (10th Cir. 2000).

Here, because neither the victim nor the prosecutor sought to rely on the nature of the acts themselves to show that the victim did not consent, evidence that the victim had during their marriage consented to those acts was irrelevant to the issue of consent.  And because the Michigan Court of Appeals reasonably concluded that the evidence was irrelevant, petitioner cannot show that the trial court's failure to allow him to cross-examine the victim on these matters violated his right to confront the witnesses against him.  *See Van Arsdall*, 475 U.S. at 679 (trial court has discretion to limit cross-examination, *inter alia*, which is "only marginally relevant."); *United States v. Rodriguez-Rodriguez*, 393 F.3d 849, 856 (9th Cir. 2005) ("Because Rodriguez's line of inquiry was not relevant to the facts of his case, the district court's restricting cross-examination did not violate the Confrontation Clause."; *Logan v. Marshall*, 540 F. Supp. 3, 6 (N.D. Ohio 1981) ("The defendant has no Sixth Amendment right to confront a witness with irrelevant evidence."), *aff'd*, 680 F.2d 1121 (6th Cir. 1982).  For the same reason, petitioner cannot show that the exclusion of this evidence violated his

right to present a defense. *See United States v. Solomon,* 399 F.3d 1231, 1239 (10th Cir. 2005)("Simply stated, a criminal defendant does not have a constitutional right to present evidence that is not relevant and not material to his defense."); *United States v. Prince-Oyibo*, 320 F.3d 494, 501 (4th Cir. 2003) ("criminal defendants do not have a right to present evidence that the district court, in its discretion, deems irrelevant or immaterial."); *Allen v. Morris*, 845 F.2d 610, 614-15 (6th Cir. 1988) ("The exclusion of irrelevant evidence cannot implicate constitutional concerns."). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on his claims relating to the rape-shield evidence.

3.    *Expert Witness (Claim IX)*

Petitioner also contends that the trial court erred in allowing a police witness to testify as an expert at trial. Detective Joseph Griggs testified that, based on the victim's testimony at the preliminary examination that she had heard a "clinking [sic] noise" while she was in the bedroom of the house and the fact that an ejected bullet was found on the floor, he suspected that the noise the victim heard may have been a racking noise made by the slide of a semi-automatic handgun being pulled back and feed a new bullet into the gun's chamber. *See* Trial Tr., Vol. III, at 60-61. To confirm his suspicion, on the day prior to trial he had the victim identify the sound she heard:

Q:    Did you make a determination yesterday or a process yesterday to determine if Ms. Taylor could identify a particular sound?

A:    I did.

Q:    How did you do that?

A:    Ms. Taylor had told me from the very start that she wasn't very familiar with handguns and didn't have any idea what types of sounds they made. Yesterday morning, we were down in the office, in the prosecutor's office downstairs. I went into a separate room. I took a handgun and I made the racking noise with the slide of that handgun, and the slide is the top part of a semi-automatic handgun that'll slide back and forth, and it actually feeds the bullet into the

20

chamber for the next round.

Q:   Let me – when you did that, was Ms. Taylor able to see – see physically what you were doing?

A:   No, I was in another room and I was out of view.

Q:   Were you within ear range so she could hear any sound that was made?

A:   Yes.

Q:   And did you create a sound that she heard?

A:   Yes, I did.

Q:   Did she identify that sound?

A:   When I made the noise, she said, "That's it, that's it."

*Id*. at 61-62.  Petitioner contends that this was improper expert testimony because Detective Griggs was not qualified as an expert, and the "test" performed by Griggs was not reliable.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

As noted above, evidentiary claims generally raise issues of state law which are not cognizable on habeas review.  This general rule regarding the limited cognizability of evidentiary claims on federal habeas review applies equally to claims based on the allegedly improper admission of scientific evidence.  *See, e.g.*, *Norris v. Schotten*, 146 F.3d 314, 335 (6th Cir. 1998); *Spencer v. Murray*, 18 F.3d 237, 239 (4th Cir. 1994); *Arnold v. Wyrick*, 646 F.2d 1225, 1228 (8th Cir. 1981); *Albanese v. McGinnis*, 823 F. Supp. 521, 553 (N.D. Ill. 1993).  Here, petitioner cannot show that he was denied a fair trial by Detective Griggs's testimony because Detective Griggs did not offer any expert or scientific testimony.  The rules regarding expert testimony apply to testimony involving "scientific, technical, or other specialized knowledge." MICH R. EVID. 702.  While Detective Griggs's testimony did involve technical knowledge with respect to his general testimony about how a gun

21

works, petitioner does not assert that this testimony deprived him of a fair trial.  Rather, petitioner argues that the testimony regarding the victim's identification of the sound deprived him of a fair trial.  This testimony, however, did not involve specialized or technical knowledge, and the procedure employed by Detective Griggs was not a scientific test.  It was simply an identification procedure:  Detective Griggs testified that he made a particular sound, and the victim identified that sound as the sound she heard in her bedroom on the day of the assault.  The testimony is no more based on technical or specialized knowledge than an officer's testimony that a witness identified a suspect in a line-up, or recognized a suspect's voice.  Thus, this testimony was not improperly admitted scientific testimony, and petitioner was not denied a fair trial by the introduction of the evidence.  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

E.      *Sentencing Claims (Claims V & VI)*

Petitioner next raises two challenges to his sentences.  First, he contends that the trial court erred in imposing the felony-firearm sentence consecutive to each of the other felonies.  Second, he contends that the trial court improperly sentenced him as a second habitual offender.  The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.      *Sentencing on Felony Firearm (Claim V)*

Petitioner argues that the trial judge improperly ordered the sentence on the felony-firearm charge to run consecutive to each of the underlying substantive convictions.  Petitioner contends that the jury was not properly instructed that it had to, and in fact did not, make specific findings that he possessed a firearm in connection with each of the underlying predicate felonies.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

Petitioner's claim is based on the Michigan Supreme Court's decision in *People v. Clark*, 463 Mich. 459, 619 N.W.2d 538 (2000) (per curiam).  In that case, the defendant was convicted of a

22

number of weapons offenses, including two counts of possessing a bomb with unlawful intent and two counts of felony-firearm. The jury was specifically instructed that, to find the defendant guilty on the felony-firearm counts, it had to find that he possessed the firearms in connection with the substantive possessing a bomb with unlawful intent crimes. Nevertheless, at sentencing the trial court ordered the felony-firearm sentences to run consecutive to all of the offenses on which petitioner was convicted, not just the two possessing a bomb convictions which provided the underlying predicate felonies for the felony-firearm convictions. *See id*. at 460-62, 619 N.W.2d at 539-40. The Michigan Supreme Court agreed with the defendant that this was error, explaining that "[f]rom the plain language of the felony-firearm statute, it is evident that the Legislature intended that a felony-firearm sentence be consecutive only to the sentence for a specific underlying felony," *id*. at 463, 619 N.W.2d at 541 (footnote omitted), and that "[n]o language in the statute permits consecutive sentencing with convictions other than the predicate offense." *Id*. at 464, 619 N.W.2d at 541. The court therefore found that the trial court had erred in ordering the felony-firearm sentences to run consecutive to all of the underlying convictions, reasoning:

> [T]he jury found that the defendant possessed a firearm while he possessed two bombs with unlawful intent. While it might appear obvious that the defendant also possessed a firearm while committing the other crimes of which he was convicted, neither a trial court nor an appellate court can supply its own findings with regard to the factual elements that have not been found by a jury.

*Id*. In reaching this conclusion, the court noted that prosecuting attorneys retain the discretion to charge multiple felonies as underlying predicate felonies, or to bring multiple felony-firearm charges based on multiple predicate felonies. *See id*. at 464 n.11, 619 N.W.2d at 541 n.11.

Applying *Clark*, the court of appeals in petitioner's case found that "the information charged defendant with possession of a firearm during commission of the charges of 'felonious assault and/or home invasion and/or kidnapping and/or criminal sexual conduct first degree,'" and thus "potentially

23

all of the charged crimes, except the possession of a dangerous weapon with unlawful intent charge, could have formed the underlying or predicate offense(s) for defendant's own felony-firearm conviction." Ct. App. op., at 5.[2]  The court also noted that the trial court's instructions to the jury repeated this "and/or" language from the information.  *See id*.  Because the jury was instructed on each predicate felony, the court found, petitioner's felony-firearm sentence could run consecutive to each of them, based on the *Clark* court's explicit endorsement of linking multiple predicate felonies to a single felony-firearm charge.  *See id*. at 5-6.  Petitioner contends that he is entitled to relief based on *Clark* because, although the information charged each underlying felony as a predicate for the felony-firearm count and the jury was so instructed, the jury was not instructed that it must specifically find that he possessed the firearm in connection with each underlying felony, and in fact made no such findings.  The Court should disagree.

Petitioner's claim is based on the court of appeals's application of a state law decision, *Clark*, which in turn interpreted a state statute.  The Michigan courts, it should be noted, have rejected petitioner's interpretation of *Clark*, holding that consecutive sentencing is appropriate with respect to each predicate felony which is listed as a predicate and on which the defendant is found guilty.  *See, e.g.*, *People v. Smith*, No. 249833, 2005 WL 354581, at *4 (Mich. Ct. App. Feb. 15, 2005) (per curiam) ("[B]ecause the prosecutor listed both charges as underlying felonies in the information and the court found defendant guilty of each underlying felony to which the felony-firearm charge was

---

[2]Neither the information nor the jury charge listed petitioner's carrying a dangerous weapon with unlawful intent charge as a predicate felony.  Subsequent to his conviction but prior to his appeal, petitioner filed various motions in the trial court, including a motion to vacate the consecutive sentences.  Ruling on that motion, the trial court amended the sentence to reflect that the felony-firearm sentence would run concurrent with, rather than consecutive to, the carrying with unlawful intent conviction.  *See People v. Southward*, No. 02-022451-FC-5, at 2 (Saginaw County, Mich., Cir. Ct. Jan. 20, 2004).

connected, defendant is not entitled to any relief on this basis."). The application of these state laws governing consecutive sentencing present issues of state law which are not cognizable on habeas review. *See Rosier v. Giurbino*, 245 Fed. Appx. 687, 688 (9th Cir. 2007); *Ashby v. Senkowski*, 269 F. Supp. 2d 109, 114-15 (E.D.N.Y. 2003); *Childs v. Zavaras*, 90 F. Supp. 2d 1141, 1149 (D. Colo. 1999).[3]

Petitioner cannot transform this state law issue into a federal one by relying on the Supreme Court's decisions in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Blakely v. Washington*, 542 U.S. 296 (2004). Those decisions, "rooted in the historic jury function [of] determining whether the prosecution has proved each element of an offense beyond a reasonable doubt, . . . hold that it is within the jury's province to determine any fact (other than the existence of a prior conviction) that increases the maximum punishment authorized for a particular offense." *Oregon v. Ice*, 129 S. Ct. 711, 714 (2009). However, the *Apprendi/Blakely* rule does not prohibit judges from finding the facts necessary to the imposition of consecutive rather than concurrent sentences for discrete offenses. *See Ice*, 129 S. Ct. at 714-15, 718. Thus, even if the jury's findings alone were insufficient to support imposing the felony-firearm conviction consecutive to each of petitioner's predicate felonies, the trial judge was free to do so without violating the Sixth Amendment as explicated in *Apprendi* and *Blakely*.

2.      *Habitual Offender Sentence (Claim VI)*

Petitioner also argues that he was improperly sentenced as an habitual offender. Petitioner's habitual offender sentence was imposed on the basis of a prior conviction in North Carolina for the

---

[3]Importantly, petitioner was not sentenced on a crime for which he was not properly convicted by the jury. He was convicted of one count of felony-firearm based on a number of separate underlying felonies, and he was given one term of imprisonment on this conviction. Petitioner does not assert that his felony-firearm conviction itself was in any way improper. The only question was whether the sentence would be consecutive to all or only some of the sentences on the underlying predicate convictions.

crime of assault on a female. As described by the Michigan Court of Appeals:

> Here, the information alleged that defendant was convicted in North Carolina on January 13, 1987 of the felony of second-degree rape. The presentence report, to which neither defense counsel nor defendant objected regarding the accuracy of defendant's criminal history, disclosed that although originally charged with second degree rape, defendant plead[ed] guilty to "assault on a female." North Carolina records admitted at defendant's post-sentencing [motion hearing] show that although this offense is labeled a misdemeanor in North Carolina, it provided for a maximum of two years imprisonment. In fact, the records reveal defendant was sentenced to two years imprisonment, suspended, and three years supervised release.

Ct. App. op., at 6. Petitioner does not dispute these underlying facts regarding his prior conviction, and they are supported by the record.[4] He does contend, however, that the North Carolina conviction was not a proper basis for imposing an habitual offender sentence. The Court should conclude that petitioner is not entitled to habeas relief on this claim, for two reasons.

First, as with petitioner's consecutive sentencing claim, petitioner's claim that the trial court improperly considered his North Carolina conviction a predicate felony for purposes of the habitual offender statute is a state law determination which is not cognizable on habeas review. "The determination by a state of what constitutes a prior felony conviction under its Multiple Offender Act presents no federal question." *United States ex rel. Nersesian v. Fay*, 239 F. Supp. 142, 143 (S.D.N.Y. 1965); *see also*, *Layton v. South Dakota*, 918 F.2d 739, 742 (8th Cir. 1990); *Jones v. Painter*, 140 F. Supp. 2d 677, 679 (N.D. W. Va.), *aff'd*, 20 Fed. Appx. 187 (4th Cir. 2001).

Second, even if the claim were cognizable, petitioner cannot show that his sentence as an

---

[4]Specifically, the North Carolina transcript of plea and judgment of sentence were attached as Exhibits A and B to the prosecutor's response to petitioner's motion for reconsideration of the trial court's ruling on his motion for resentencing. The prosecutor's response, in turn, was attached as Appendix H to petitioner's application for leave to appeal in the Michigan Supreme Court in connection with his post-conviction motion for relief from judgment. Petitioner's application for leave to appeal, and hence the documents relating to his North Carolina conviction, are part of the Rule 5 materials filed in this Court by respondent.

habitual offender was improper.  Under the Habitual Offender Act, a defendant is subject to sentence as an habitual offender if he previously "has been convicted of a felony or an attempt to commit a felony, whether the conviction occurred in this state or would have been for a felony or attempt to commit a felony in this state if obtained in this state."  MICH. COMP. LAWS § 769.10(1).  "The act requires that the offense be a felony in Michigan under Michigan law, irrespective of whether the offense was or was not a felony in the state or country where originally perpetrated. Hence, the facts of the out-of-state crime, rather than the words or title of the out-of-state statute under which the conviction arose, are determinative." *People v. Quintanilla*, 225 Mich. App. 477, 479, 571 N.W.2d 228, 228 (1997) (per curiam).

Here, petitioner was originally charged in North Carolina with second degree rape, and pleaded guilty to a lesser charge of assault on a female.  Although assault on a female is not a lesser offense of attempted second degree rape under North Carolina law, *see State v. Wortham*, 351 S.E.2d 294, 296-97 (N.C. 1987), both attempted second degree rape and assault on a female are lesser offenses of second degree rape for which a defendant charged with second degree rape may be convicted.  *See* N.C. GEN. STAT. § 15.144.1(a).  Thus, the charge and plea in the North Carolina case establish that the conduct underlying petitioner's conviction in that case stemmed from some sort of a completed or attempted sexual assault.  And, as the court of appeals observed, "[i]n Michigan, an assault committed with the intention of committing [a sexual assault] is either a five-year or ten-year felony."  Ct. App. op., at 6 (citing MICH. COMP. LAWS § 750.520g)  Thus, the trial court did not err in finding that petitioner's prior North Carolina conviction was a felony for purposes of the Michigan habitual offender statute.

Petitioner also suggests that, in relying on the North Carolina conviction, the trial court sentenced him based on inaccurate information, invoking the rule established in *Townsend v. Burke*,

27

334 U.S. 736 (1948), and *United States v. Tucker*, 404 U.S. 443 (1972).  In both of those cases, "the United States Supreme Court invalidated defendants' sentences because they were imposed by trial courts in reliance upon material false assumptions of fact." *Eutzy v. Dugger*, 746 F. Supp. 1492, 1504 (N.D. Fla. 1989) (discussing *Townsend* and *Tucker*); *accord Stewart v. Peters*, 878 F. Supp. 1139, 1144 (N.D. Ill. 1995) (same).  *See generally*, *Tucker*, 404 U.S. at 448-49; *Townsend*, 334 U.S. at 740-41.  It is well established, however, that a *Tucker* violation arises only where the improper information "actually served as the basis for the sentence." *United States v. Jones*, 40 Fed. Appx. 15, 17 (6th Cir. 2002) (internal quotation omitted); *see also*, *Lechner v. Frank*, 341 F.3d 635, 639 (7th Cir. 2003); *United States v. Johnson*, 767 F.2d 1259, 1276 (8th Cir. 1985).  "A sentencing court demonstrates reliance on misinformation when the court gives 'explicit attention' to it, 'found[s]' its sentence 'at least in part' on it, or gives 'specific consideration' to the information before imposing sentence." *Lechner*, 341 F.3d at 639 (quoting *Tucker*, 404 U.S. at 444, 447).  Thus, to be entitled to habeas relief on this claim  petitioner "must show that the sentencing court actually relied on this information and that it was materially false." *Hanks v. Jackson*, 123 F. Supp. 2d 1061, 1074 (E.D. Mich. 2000) (Gadola, J.).

Petitioner does not, however, dispute the facts underlying the existence of the North Carolina conviction.  Rather, he argues that the trial court and court of appeals inaccurately concluded that this conviction constitutes a felony under the Michigan habitual offender statute.  This argument challenges not the accuracy of the information relied upon by the trial court, but the legal conclusion drawn by the trial court.  Thus, petitioner has failed to raise a *Townsend* claim.  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.     *Discovery Claim (Claim VII)*

In his seventh habeas claim, petitioner contends that he was denied a fair trial by the

28

introduction of a pair of panties which the police claimed to have recovered from the road and which

the victim, at trial, testified were the panties she was wearing on the day of the assault and had thrown

out the window.  The existence of the panties was first disclosed during the preliminary examination.

*See* Prelim. Exam. Tr., at 61.  Petitioner contends that the trial court violated the Michigan Court

Rules governing discovery by failing to disclose the existence of the panties earlier.  *See* MICH. CT.

R. 6.201(A)(6), (B)(1).  Petitioner also contends that he was denied a fair trial by the late disclosure

of medical reports of the victim's injuries.  The Court should conclude that petitioner is not entitled

to habeas relief on this claim.

      1.    *Violation of Discovery Rules*

To the extent that petitioner's claim is based on the prosecutor's alleged violation of the

Michigan discovery rules, the claim is not cognizable on habeas review.  As the Supreme Court has

explained, "there is no general constitutional right to discovery in a criminal case, and *Brady* did not

create one."  *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977); *accord Gray v. Netherland*, 518 U.S.

152, 168 (1996).  Thus, any violation of the state law discovery rules raises an issue not cognizable

on habeas review.  *See Lorraine v. Coyle*, 291 F.3d 416, 441 (6th Cir. 2002); *Burns v. Lafler*, 328 F.

Supp. 2d 711, 723 (E.D. Mich. 2004) (Gadola, J.); *Meade v. Lavigne*, 265 F. Supp. 2d 849, 867 (E.D.

Mich. 2003) (Tarnow, J.).

      2.    *Suppression of Exculpatory Evidence*

To the extent that petitioner claims that the failure to disclose the panties constituted the

suppression of exculpatory evidence in violation of his right to due process of law, the Court should

conclude that petitioner's claim is without merit.

      *a.  Clearly Established Law*

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held "that the suppression by

29

the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87.   However, as noted above, "there is no general constitutional right to discovery in a criminal case, and *Brady* did not create one." *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977).   Thus, in order to establish a *Brady* violation, petitioner must show that the prosecutor (1) withheld evidence that was both (2) favorable to the accused and (3) material to guilt or punishment.   *See United States v. Presser*, 844 F.2d 1275, 1281 (6th Cir. 1988).   Furthermore, regardless of the exculpatory nature or materiality of the evidence withheld by the prosecution, "[n]o *Brady* violation exists where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available to defendant from another source." *United States v. Clark*, 928 F.2d 733, 738 (6th Cir. 1991) (citations omitted) (internal quotation omitted); *accord United States v. Mullins*, 22 F.3d 1365, 1371 (6th Cir. 1994). Thus, petitioner's claim raises three questions: (1) was the evidence suppressed by the prosecution in that it was not known to petitioner and not available from another source?; (2) was the suppressed evidence favorable or exculpatory?; and (3) was the evidence material to the question of petitioner's guilt? *See Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000); *Luton v. Grandison*, 44 F.3d 626, 628-29 (8th Cir. 1994); *see also*, *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *Moore v. Illinois*, 408 U.S. 786, 794-95 (1972).   Petitioner bears the burden of establishing each of these three elements. *See Carter*, 218 F.3d at 601.   If all three of these questions are answered in the affirmative, petitioner has established a constitutional error entitling him to the writ of habeas corpus, and "there is no need for further harmless-error review." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).   If, on the other hand, any of these three questions is answered in the negative, then petitioner has failed to establish a *Brady* violation.

*b.  Analysis*

Here, petitioner cannot establish a *Brady* violation, for two reasons.  First, petitioner cannot show that the evidence was suppressed within the meaning of *Brady*.  The record establishes that, at the latest, the panties were disclosed to petitioner and his counsel at the preliminary examination, *see* Prelim. Exam. Tr., at 61, which was conducted nearly four months before the start of petitioner's trial.  Because the purpose of *Brady* is to permit a defendant to put all exculpatory information before the jury, "*Brady* generally does not apply to delayed disclosure of exculpatory information, but only to a complete failure to disclose."  *United States v. Davis*, 306 F.3d 398, 421 (6th Cir. 2002) (internal quotation omitted).  Even where " previously undisclosed evidence is disclosed . . . during trial, no *Brady* violation occurs unless the defendant has been prejudiced by the delay in disclosure."  *Norris v. Schotten*, 146 F.3d 314, 334 (6th Cir. 1998) (internal quotation omitted); *accord Davis*, 306 F.3d at 421 ("Delay violates *Brady* only where the delay causes prejudice."); *United States v. Bencs*, 28 F.3d 555, 560-61 (6th Cir. 1994).  Similarly, according to petitioner the medical reports were provided to petitioner at least the day before trial, and possibly several days before trial.  Here, petitioner has not shown any prejudice to his case by the disclosure of the panties four months prior to trial or the medical reports the day before trial.

Second, petitioner has not shown that the panties and medical reports were exculpatory. Petitioner contends that the panties were not, in fact, those worn by the victim on the day of the assault, and suggests that had they been disclosed earlier forensic testing could have proved this fact. Petitioner does not, however, suggest what type of testing could have been performed to determine whether the panties submitted by the prosecutor were worn by the victim on any particular date.  The lack of any bodily fluids would not have been exculpatory, in light of the victim's testimony that she threw the panties out the car window before the sexual assault.  Nor has he shown why it was

31

impossible to obtain this forensic testing in the four months between the preliminary examination and trial. With respect to the medical report, this report documents the victim's report of the rape and the injuries she sustained, and thus was not exculpatory.

In short, the panties and medical reports were neither suppressed by the prosecutor nor exculpatory evidence. Thus, petitioner cannot establish a *Brady* violation and the prosecutor's alleged failure to comply with the state discovery rules provides no basis for habeas relief. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

G.    *Jury Selection Claim (Claim X)*

Petitioner next claims that he was denied a fair trial because his jury was improperly selected. At the time of jury selection, there was apparently a discrepancy between the jury venire in the courtroom and the names in the box from which the venire members were randomly drawn to fill the jury:

> THE COURT:       All right. Ladies and gentlemen, we're going to start calling the numbers. We have groups F and H? All right. Go ahead.
>
> THE CLERK:       Seat No. 1, Juror 179, Milton Adams.
>                       Okay. I think we got the wrong group, Judge.
>
> THE COURT:       Okay. You got the wrong box, probably.
>
> THE CLERK:       No, she gave me box F here. These are all 100 –
>
> THE COURT:       Well, the numbers, if we have groups F and H, we have a group F, starts with 1 through 35, and H goes from 74 to 109.
>
> THE CLERK:       I do have some that fall within these groups, but then I have other capsules that don't, so I'll just have to call them, right? I don't know what to do because she does have some here that–
>
> THE COURT:       Who brought you the box? Barbara?
>
> THE CLERK:       She handed me – yeah, when we went to get the jurors, I got the box from here.
>
> THE COURT:       All right. Let's give it a whirl. This has never happened before, but we'll try it. Remember, it's one through 35, Priscilla, and 74 through 109. If there's anything over 109, just forget it.
>
>       [clerk calls several names]

32

| THE COURT: | Any of you know what groups you're in?  Is anybody here from H? |
| THE JURORS: | H and F. |
| THE COURT: | Nobody here from J? |
| THE JURORS: | No. |
| THE CLERK: | She gave me J's.  She didn't give me H. |
| THE COURT: | All right.  We're going to wait a few moments because right now, it looks like the only ones that are in the box are numbers from F and J, and apparently there are no H numbers in the box.  So rather than proceed any further right now, we're going to wait a couple of minutes.  Any of you have a place to sit down for a moment?  Barbara's coming . . . . |

. . . .

| THE COURT: | Okay.  Barbara, you gave me the wrong numbers, you didn't give me H's.  You gave me F and J, but you sent in F and H.  Have you got the H numbers?  First time it's happened to me in 16, so – all right.  If you give me a second, Barbara will bring in the H numbers, so those of you that are in the H category and thought you were safe because none of your numbers are in there, guess what's going to happen?  There's going to be a lot of H's get called in a few minutes.  Got it.  She pulled out the other numbers, so give her back the J's and the J's in another courtroom, Barbara?  Barbara?  The J's go in another courtroom? |
| MS. SHOENS: | No, they went home.  They're dismissed. |
| THE COURT: | Well, we were going to call their numbers, so you'd have to call them back.  Not a problem, Barbara, don't worry about it.  Put some Bingo numbers in there, Barbara.  All right.  Here we go. |

Trial Tr., Vol. I, at 43-46.

Petitioner contends that the trial judge "excused" the jurors from Group J, in violation of the randomness requirements reflected in the Jury Selection and Service Act (JSSA), 28 U.S.C. § 1861 *et seq*.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

At the outset, petitioner's claim that the jury was not randomly selected is belied by the record. Petitioner does not assert that the jurors in Groups F and H were not selected pursuant to a random selection method, or that those groups themselves were not composed from the master jury list in a random fashion.  Nor does it appear that the trial court "excluded" any jurors from Group J.  Rather,

33

it appears that the clerk had simply erred in giving the box containing the Group J names to the judge rather than the box containing the Group H names.[5]  In any event, even if there was some manner in which the composition of the jury venire was not random, petitioner has failed to show a violation of his constitutional rights cognizable on habeas review.

"The sixth amendment does not guarantee a randomly selected jury."  *Coleman v. McCormick*, 874 F.2d 1280, 1283 (9th Cir. 1989); *see also*, *United States v. Hawkins*, 566 F.2d 1006, 1012 (5th Cir. 1978).  The Sixth Amendment does guarantee a criminal defendant the right to be tried before a jury drawn from a fair cross-section of the community, *see Duren v. Missouri*, 439 U.S. 357, 359 (1979); *Taylor v. Louisiana*, 419 U.S. 522, 526-31 (1975), but petitioner has not asserted a fair cross-section claim,[6] nor does the record suggest that substituting the Group H jurors for the Group J jurors in any way resulted in a panel that was not drawn from a fair cross-section of the community.  Petitioner's only argument is that the trial court's actions violated the JSSA.  Even if this were so, it is irrelevant as by its terms the JSSA governs only the selection of jurors in federal criminal trials.  *See* 28 U.S.C. § 1861.  It is not applicable to state criminal trials, and thus a state court's failure to abide by the requirements of the JSSA does not provide a basis for habeas relief.  *See Stanley v. Deppisch*, No. 08-cv-0164, 2009 WL 62155, at *3 (W.D. Wis. Jan. 8, 2009); *Esty v. McDonough*, No.

---

[5]In his amended memorandum, petitioner suggests that there was some sort of prosecutorial involvement in the "switching" of the jury venires designed to allow the prosecutor to excuse jurors on the basis of their race and to artificially create a pro-prosecution venire.  There is simply nothing in the record that suggests such an involvement by the prosecution.  Rather, as the transcript reflects, this was simply a matter of the wrong box of names being given to the trial judge's clerk, rather than any "switching" of the venires.

[6]Petitioner notes the fair-cross section requirement in his reply brief, but does not argue that any distinctive group of the community was systematically excluded in his trial.  Rather, he continues to argue only that "a manipulation of the jury selection process deprived him of the right to be tried by a fair [and] impartial jury," Reply, at 13, not that he was deprived of a jury drawn from a fair cross-section of the community.

3:04cv363, 2007 WL 1294602, at *37 n.23 (N.D. Fla. May 1, 2007).  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

H.      *Ineffective Assistance of Counsel (Claims I, II, VIII, & XI)*

Finally, petitioner raises a number of ineffective assistance of counsel claims.  In Claim I, he argues that counsel was ineffective for failing to present evidence of a letter written by the victim to petitioner while he was in jail and evidence that she had visited him in jail, and for failing to challenge a juror who was biased against him.  In Claim VIII, he contends that trial counsel was ineffective for failing to seek suppression of evidence recovered from the search of his car and evidence which was not timely disclosed by the prosecutor.  In Claim II he contends that he was denied the effective assistance of appellate counsel because the court of appeals failed to order an evidentiary hearing, and in Claim XI he contends that counsel was ineffective for failing to raise his habeas claims on direct appeal.  The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.      *Clearly Established Law*

The Sixth Amendment right to counsel and the corollary right to effective assistance of counsel protect the fundamental right to a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).  To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense.  *Id*. at 687.  These two components are mixed  questions of law and fact.  *See id*. at 698.  Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."  *Id.* at 697.  If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed."  *Id.*

35

With respect to the performance prong of the inquiry, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id.* at 689; *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

2.    *Trial Counsel (Claims I & VIII)*

*a. Failure to Introduce Letter and Jail Visits*

Petitioner first contends that trial counsel was ineffective for failing to introduce evidence that, after the assault, the victim wrote petitioner "love letters" and visited him in jail. He argues that counsel misadvised him that the letters might not be admissible. The court of appeals rejected this claim, explaining:

> On the first day of trial, defense counsel noted on the record that defendant had specifically requested that he not introduce this evidence at trial, regardless of whether this evidence was admissible. Defendant then confirmed this decision, asserting that he did not believe this evidence would be useful in his defense. Subsequently, in a letter addressed to defendant's appellate counsel and attached to defendant's post-conviction motions, trial counsel stated explicitly that he had wanted to use this evidence at trial, but that defendant had insisted that he not do so. He also explained that he believed that defendant's decision had harmed his case. Thus, the record shows that not only did defendant himself make the decision to exclude this evidence, but also that this decision was contrary to trial counsel's own advice. Accordingly, defendant has failed to show that trial counsel's performance was deficient in regard to these letters.

36

Ct. App. op., at 2.  The same analysis applied to petitioner's claim regarding the victim's visits at the

jail.  *See id*. at 2-3.  The Court should conclude that this determination was reasonable.

The record makes clear that it was petitioner who directed that counsel not introduce this

evidence.  On the first day of trial, counsel brought this matter to the court's attention:

|  |  |
|---|---|
| MR. WHITE: | I would indicate that sometime in January, one of my conferences, my client made me aware that the victim, Shelley Taylor, has been writing him at the jail, and actually, he had quite a few letters and postcards signed not Shelley Taylor, but they have this thing where she signs them Proud Mary, and she addresses them to Ike, Ike and Tina Turner, supposed to be an inside joke with them. |
|  | Well, anyway, I looked at them, asked him to provide me copies because under the discovery rules, I know that I have to furnish them to the prosecutor well in advance if we're going to use them.  So I did obtain those from my client.  I wasn't at all certain if the Court would rule that they were admissible inasmuch as they are from a time period of December 2002 up until the present.  She's been visiting him up until last week even. |
|  | So for one thing, I don't know if they're even admissible.  But late last week, my client contacted me and said he changed his mind, he did not want me to use these at trial if I would even be allowed to use them.  And so I've returned them to him, and as of right now, it's his intention that I not use them.  Is that correct, Mr. Southward? |
| THE DEFENDANT: | Well, I don't know where – where they would help at.  It mean, it's letter from – from her, but I don't know if they would help.  So – |
| THE COURT: | Well, if you're not going to use them, then fine, then that'll be part of the record, they are not to be introduced into evidence. |

Trial Tr., Vol. I, at 11-12.  Petitioner contends that his decision was based on counsel's uncertainty

regarding the admissibility of the letters, but the record belies this claim.  Counsel explicitly stated

that petitioner instructed counsel that he did not want to use the letters even if admissible, and

petitioner affirmed that this was his desire.  Counsel's post-conviction letter to petitioner's appellate

counsel confirms that petitioner told counsel not to introduce the letters or the fact that the victim

2:08-cv-10398-GCS-PJK   Doc # 17   Filed 07/24/09   Pg 38 of 49   Pg ID 1007

continued to visit petitioner in jail.[7]  Petitioner cannot show that counsel was ineffective for following his instructions.  *See Keith v. Mitchell*, 455 F.3d 662, 672 (6th Cir. 2006) ("an otherwise constitutionally ineffective strategy is not a ground for habeas relief if the client knowingly directed the strategy."); *United States v. Wellington*, 417 F.3d 284, 289 (2d Cir. 2005) ("to the extent that defendant instructed his counsel to pursue a course of action that defendant now complains of, there was no abridgement–constructive or otherwise–of the defendant's Sixth Amendment right to effective assistance of counsel."); *cf. Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000) ("[A] defendant who explicitly tells his attorney *not* to file an appeal plainly cannot later complain that, by following his instructions, his counsel performed deficiently.").  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on these ineffective assistance of counsel claims.

### b.  Failure to Challenge Juror

Petitioner next contends that counsel was ineffective for failing to challenge a biased juror. The day following jury selection, prior to opening arguments, one of the seated jurors informed the court that she had failed to report during *voir dire* that she had been a victim of statutory rape.  The juror was questioned by the court, the prosecutor, and defense counsel outside the presence of the other jurors:

| | |
|---|---|
| JUROR CLARK: | When I was a child, I was statutorily raped. |
| THE COURT: | Okay. |
| JUROR CLARK: | So it was with my consent, but he was an adult, and I was a child. |
| THE COURT: | Okay.  Do you believe that would affect your ability to be – |
| JUROR CLARK: | I want to say no, but the fact that I didn't bring it up yesterday makes me wonder if it would or not.  Subconsciously, I don't think I would, you know?  I think I would look at the facts of the case.  My concern is that I didn't bring it up yesterday. |

---

[7]This letter is attached as Appendix 2 to petitioner's application for leave to appeal in the Michigan Supreme Court on direct appeal.

|                |                                                                                                                                                                                                                                                                                                                                                                                       |
|----------------|---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                | Why didn't I?                                                                                                                                                                                                                                                                                                                                                                          |
| THE COURT:     | Okay.  Did it come to your mind yesterday?                                                                                                                                                                                                                                                                                                                                             |
| JUROR CLARK:   | It did, and it just –                                                                                                                                                                                                                                                                                                                                                                  |
| THE COURT:     | How many years again would this have occurred?                                                                                                                                                                                                                                                                                                                                         |
| JUROR CLARK:   | Twenty-five.                                                                                                                                                                                                                                                                                                                                                                           |
| THE COURT:     | Twenty-five years ago?                                                                                                                                                                                                                                                                                                                                                                 |
| JUROR CLARK:   | Yeah, it was a long time ago.                                                                                                                                                                                                                                                                                                                                                          |
| THE COURT:     | Okay.                                                                                                                                                                                                                                                                                                                                                                                  |
| JUROR CLARK:   | You know, I don't feel like there's any animosity still, but just the fact that I didn't bring it up when I was here yesterday when the question was asked.                                                                                                                                                                                                                             |
| THE COURT:     | Uh-huh.  I appreciate it.  Any questions, Mr. Stroud?                                                                                                                                                                                                                                                                                                                                  |
| MR. STROUD:    | Ms. Clark, do you have a concern because of the nature of this case that it might influence you thinking or – or are you – I guess I'm wondering if your concern is simply that you didn't mention it or if there's something else.                                                                                                                                                       |
| JUROR CLARK:   | I think it's more that I didn't mention it.  I mean, it's the same, I guess, type of a case.  Mine never went to court or trial or anything like that, you know, I don't have any animosity or any – I don't believe that it would sway my opinion one way or the other.                                                                                                                  |
| MR. STROUD:    | Okay.  Thank you, ma'am.                                                                                                                                                                                                                                                                                                                                                               |
| THE COURT:     | Any questions, Mr. White?                                                                                                                                                                                                                                                                                                                                                              |
| MR. WHITE:     | Yes, Your Honor.  Ma'am, in a case like this, when credibility is apt to be an important issue, because of your experience, would you be more likely to believe the victim in this case?                                                                                                                                                                                                |
| JUROR CLARK:   | I don't believe I would, no.                                                                                                                                                                                                                                                                                                                                                           |
| MR. WHITE:     | And because of your experience, as you come to court, do you bear any particular animosity towards someone who is the accused in a case of that type?                                                                                                                                                                                                                                   |
| JUROR CLARK:   | I don't believe so, no.                                                                                                                                                                                                                                                                                                                                                                |
| MR. WHITE:     | Thank you.  That's all.                                                                                                                                                                                                                                                                                                                                                                |
| THE COURT:     | From what I gather from what you're saying, Ms. Clark, that – that you felt that you should have mentioned it to us yesterday, that may be true, but you do not believe that this affects you ability to be impartial in this case and give both parties a fair hearing?                                                                                                                  |
| JUROR CLARK:   | I don't believe it would affect it at all.                                                                                                                                                                                                                                                                                                                                             |
| THE COURT:     | Okay.  And, you know, I said to you yesterday that you're to decide the case solely based on the evidence as you hear it presented from the witness stand together with such exhibits as I allow into evidence and make your decision solely on that criteria.  Can you tell me that you have no problem in doing that?                                                                    |
| JUROR CLARK:   | I wouldn't have a problem with that, no.                                                                                                                                                                                                                                                                                                                                               |

Trial Tr., Vol. II, at 4-7.  The judge then asked the prosecutor and defense counsel whether either of them wished to challenge Juror Clark for cause.  Both declined to do so.  *See id.* at 7.

The Michigan Court of Appeals rejected petitioner's claim that counsel was ineffective for failing to challenge Juror Clark, concluding that there was no cause for striking Juror Clark and that any challenge for cause therefore would have been meritless.  The court reasoned that the juror had come forward on her own before the trial began, that her primary concern was with her failure to come forward before rather than her ability to be impartial, and that "[s]he stated unequivocally that she did not believe that this experience would affect her ability to be impartial in rendering a verdict in the present case."  Ct. App. op., at 3.  The court also rejected petitioner's claim that counsel should have used a peremptory challenge to this juror, noting that such decisions are tactical decisions subject to counsel's subjective judgment.  *See id.*  The Court should conclude that these determinations were reasonable.

"[J]ury selection is a process that inherently falls within the expertise and experience of trial counsel."  *Palacio v. State*, 511 S.E.2d 62, 67 (S.C. 1999) (citing cases).  Because of this, counsel's decisions in the jury selection process are the type of strategic decisions which are particularly difficult to attack.  *See Romero v. Lynaugh*, 884 F.2d 871, 878 (5th Cir. 1989); *Cordova v. Johnson*, 993 F. Supp. 473, 530 (W.D. Tex.) (footnote omitted) (internal quotation omitted) ("Selecting a jury is more art than science. There is nothing unreasonable or professionally deficient in a defense counsel's informed decision to rely upon his own reading of venire members' verbal answers, body language, and overall demeanor[.]"), *aff'd*, 157 F.3d 380 (5th Cir. 1998).  Here, petitioner has offered nothing to suggest that counsel's decision to keep Juror Clark on the panel was anything other than trial strategy based on his assessment of Juror Clark's ability to render a fair verdict.  Accordingly, this Court should not second-guess counsel's judgment.

Further, petitioner cannot show that he was prejudiced by counsel's failure to remove Juror Clark from the panel. In order to establish prejudice attributable to a counsel's failure to remove a juror, petitioner must show that the juror was actually biased. *See Miller v. Francis*, 269 F.3d 609, 616 (6th Cir. 2001); *Hughes v. United States,* 258 F. 3d 453, 458 (6th Cir. 2001); *Irons v. Lockhart*, 741 F.2d 207, 208 (8th Cir. 1984); *Parker v. Turpin*, 60 F. Supp. 2d 1332, 1362 (N.D. Ga. 1999); *Odle v. Calderon*, 919 F. Supp. 1367, 1389 (N.D. Cal. 1996). Here, petitioner has offered nothing to demonstrate that Juror Clark was actually biased against him. In the first place, Juror Clark repeatedly affirmed that she could set aside her personal views and decide the case based on the evidence, and petitioner has pointed to nothing to call into question the sincerity of Juror Clark's assurance. *See Patton v. Yount*, 467 U.S. 1025, 1036 (1984) (question in case of juror bias is whether juror swore "that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed."); *Howard v. Davis*, 815 F.2d 1429, 1431 (11th Cir. 1987) (habeas relief not warranted on petitioner's claim of juror bias where juror stated he could be impartial despite his relationship with the victim). Second, Juror Clark's having been a victim of statutory rape does not alone demonstrate bias. *See Gonzales v. Thomas*, 99 F.3d 978, 989-90 (10th Cir. 1996). "Being the victim of a crime is not alone grounds to remove a juror." *United States v. Gibbs*, 125 F. Supp. 2d 700, 709 (E.D. Pa. 2000), *aff'd*, 77 Fed. Appx. 107 (3d Cir. 2003).

The Tenth Circuit's decision in *Gonzales* is instructive. In that case, the petitioner argued that a juror who had been the previous victim of a rape was biased, or alternatively that the court should imply bias, in his trial for rape. The court rejected this argument, finding that there was no evidence of actual bias and that implied bias could not be found on the mere basis that the juror had previously been the victim of a rape. *See Gonzales*, 99 F.3d at 989-90. Turning to the particular circumstances of the case, the court noted that the rape the juror had suffered had been 25 years before the trial,

41

when she was 19 years old.  She was forced to have sex with someone that she knew and with him she had gone on a date, and alcohol had been involved.  No weapon or violence was used, no criminal investigation or prosecution resulted, and the juror testified that the experience was not particularly traumatic.  *See id*. at 990.  The petitioner's case, on the other hand, involved repeated, forcible penetration of the victim which caused her psychological trauma.  *See id*.  The court found that based on the passage of 25 years between the juror's rape and the trial, the differences between the crimes, the juror's testimony that her rape was not a traumatic, life-changing event, and the fact that the juror never reported the rape and "therefore apparently never underwent the experience of being the accuser in a case where the alleged rapist was claiming she consented to sexual intercourse," *id*. at 991, the court could not say that the juror's "rape experience rendered her biased against" the petitioner.  *Id*. at 990-91.

Here, as in *Gonzales*, there was a twenty-five year gap between the juror's sexual assault and petitioner's trial.  As in *Gonzales*, the juror did not view her experience as particularly traumatic, and no criminal prosecution resulted in which the juror was required to undergo an accuser claiming consent.  And as in *Gonzales* the circumstances of the juror's experience and the charges against petitioner were significantly different.  Petitioner was charged with abducting the victim at gunpoint and repeatedly raping her against her will, while the juror stated that she had engaged in otherwise consensual sex while a minor.  In these circumstances, there is no basis for the court to "presume as a matter of law [Juror Clark] was a biased juror in [petitioner's] trial."  *Gonzales*, 99 F.3d at 991.  Because there is no basis to presume that Juror Clark was biased, and because there is no evidence in the record to suggest actual bias or to doubt Juror Clark's repeated assertions that she could be impartial, petitioner cannot show either that counsel was deficient for failing to strike Juror Clark or that he was prejudiced by counsel's failure.  Accordingly, the Court should conclude that petitioner

is not entitled to habeas relief on this claim.

### c. Failure to Seek Suppression of Evidence from Petitioner's Car

Petitioner next contends that counsel was ineffective for failing to suppress evidence obtained from a search of his car. At trial, Officer Tracy Johnson testified that on the morning of the incident she was dispatched to the home of petitioner's mother. She observed petitioner's vehicle parked on the grass beside the house. She reported her discovery of the vehicle, and was asked to check the vehicle for a weapon. She opened the car door and looked for a weapon in plain view. She did not touch or move anything in the vehicle. She did not see any weapon, but did observed two drops of blood. She advised the sergeant in charge of the investigation what she had observed, and was told to impound the vehicle. *See* Trial Tr., Vol. III, at 22-25. Petitioner contends that he was renting a room from his mother, that the car was parked within the curtilage of his home, and that therefore Officer Tracy's warrantless entry into the vehicle violated the Fourth Amendment. Petitioner argues, therefore, that counsel was ineffective for failing to file a motion to suppress the evidence seized from the vehicle. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

"Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." *See Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986). Here, petitioner can establish neither that the evidence would have been suppressed nor that there is a reasonable probability that the outcome of the trial could have been different even absent the evidence found in his car.

First, petitioner cannot show a reasonable probability that, had counsel filed a motion to suppress, it would have been granted. "[T]he automobile exception to the warrant requirement

43

permits the search of a vehicle without a warrant if there is probable cause to believe that the car contains contraband or evidence." *United States v. Webb*, 83 F.3d 913, 916 (7th Cir. 1996) (citing *Carroll v. United States*, 267 U.S. 132, 153-56 (1925)).  Here, the victim had reported being assaulted and repeatedly raped in the car, and thus there is no question that the police had probable cause to believe that petitioner's car contained evidence of a crime.  There is some authority that this exception "may not apply when [the vehicle] is parked at the residence of the criminal defendant challenging the constitutionality of the search." *United States v. Fields*, 456 F.3d 519, 524-25 (5th Cir. 2006).  Even assuming that this is a correct statement of Fourth Amendment law and that it applies to petitioner's case, the warrantless search of petitioner's car was nevertheless justified by exigent circumstances.  At the time of Officer Johnson's search, the police had knowledge that petitioner was armed and had threatened to kill both himself and the victim.  Neither petitioner's location nor the location of the gun was known.  Knowledge of whether petitioner was still armed was necessary to protect the police and public, and the presence of the gun in the car, unlocked and accessible to the public, presented a danger to public safety.  *See Cady v. Dombrowski*, 413 U.S. 433, 448 (1973) (police justified in searching trunk of car based on probable cause to believe gun was in trunk, where car was vulnerable to intrusion by vandals).  "As the Supreme Court indicated in *Cady*, . . . to conduct an on-the-spot inventory search of a car which an officer reasonably suspects may contain a gun is reasonable because it ensures the immediate protection of the public's safety." *United States v. Feldman*, 788 F.2d 544, 553 (9th Cir. 1986); *see also*, *United States v. White*, 607 F.2d 203, 208 (7th Cir. 1979) (warrantless search of defendant's briefcase permissible where defendant may have either placed gun in the briefcase or disposed of it in public; the police "had the right and duty to avert possible danger to themselves and the public by finding and holding the gun.").  Thus, even if Officer Johnson's search was not a permissible warrantless automobile search, it was a permissible

44

warrantless search based on the existence of exigent circumstances.

Further, even if a motion to suppress had been made and granted, there is not a reasonable probability that the result of petitioner's trial would have been different.  Even if Officer Tracy's search would have rendered inadmissible any evidence seized from the car,[8] this would not have changed the outcome of the trial.  No semen was recovered from the car.  *See* Trial Tr., Vol. III, at 51. The only evidence recovered from the car was four small stains of human blood, but this blood was not matched to the victim or any other person.  *See id.* at 52.  Given the minimal amount and probative value of the evidence found in petitioner's car, and the significant eyewitness and victim testimony, the exclusion of the evidence from the car would likely have had little effect on the jury's assessment of the evidence of petitioner's guilt.

Because petitioner can show neither that his Fourth Amendment claim is meritorious nor a reasonable probability that the result of the proceeding would have been different had this evidence been excluded, petitioner cannot show that he was prejudiced by counsel's failure to file a motion to suppress this evidence.  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### d. Failure to Seek Suppression of Late Disclosed Evidence

Petitioner next contends that counsel was ineffective for failing to seek suppression of late disclosed evidence, in particular the victim's panties as discussed in part F, *supra*, and medical reports

---

[8]Petitioner does not assert that the impounding of his car subsequent to Officer Johnson's search was invalid, or that the search of the car after impoundment was unconstitutional.  The record does not establish whether or not a warrant was obtained to impound the car, and certainly the victim's report of the crime would have provided probable cause to search the car independent of any information obtained by Officer Johnson in her initial search.  Thus, it is questionable whether a finding that Officer Tracy's search was unconstitutional would have rendered the subsequently obtained evidence inadmissible.

45

concerning the victim.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

As noted above, the prosecution did not violate *Brady* with respect to the disclosure of the panties and medical reports, and thus a motion to suppress the evidence on the basis of *Brady* would have been futile.  Counsel's only basis to seek suppression of the evidence would have been under the state court discovery rules.  However, petitioner cannot show a reasonable probability that such a motion would have been granted.  Although a trial court has the authority to preclude evidence as a result of a violation of the criminal discovery rules, *see* MICH. CT. R. 6.201(J), the Michigan Court of Appeals has cautioned that "exclusion of otherwise admissible evidence is an extremely severe sanction that should be limited to egregious cases."  *People v. Greenfield*, 271 Mich. App. 442, 454 n.10, 722 N.W.2d 254, 261 n.10 (2006).  Particularly with respect to the panties, which were disclosed nearly four months prior to trial, petitioner has not shown his to be an "egregious case."  More importantly, exclusion of evidence based on a violation of Rule 6.201 is not appropriate in the absence of evidence that the prosecutor's discovery violation caused petitioner actual prejudice.  *See id*.  As explained in part F.2.b, *supra*, petitioner has not identified any prejudice to his case resulting from the delayed disclosure of the panties and medical reports.  Thus, there is not a reasonable probability that a motion to suppress this evidence under Rule 6.201(J) would have been successful, and petitioner therefore is not entitled to habeas relief on this claim.

3.     *Appellate Counsel (Claims II & XI)*

Petitioner next raises two challenges to the effectiveness of his appellate counsel.  The Court should conclude that petitioner is not entitled to habeas relief on these claims.

*a. Lack of Evidentiary Hearing (Claim II)*

Petitioner contends that the trial court and Michigan Court of Appeals rendered appellate

46

counsel ineffective by denying his requests for an evidentiary hearing. Nothing in the Constitution requires a state to establish a system of postconviction review, and thus "an infirmity in a state post-conviction proceeding does not raise a constitutional issue cognizable in a federal habeas petition." *Gee v. Groose*, 110 F.3d 1346, 1351-52 (8th Cir. 1997) (internal quotation omitted); *accord Dawson v. Snyder*, 988 F. Supp. 783, 826 (D. Del. 1997) (citing *Steele v. Young*, 11 F.3d 1518, 1524 (10th Cir. 1993) and *Duff-Smith v. Collins*, 973 F.2d 1175, 1182 (5th Cir. 1992)). The trial court's failure to hold an evidentiary hearing, even if erroneous under state law, does not entitle petitioner to habeas relief. *See Chaussard v. Fulcomer*, 816 F.2d 925, 932 (3d Cir. 1987); *Edwards v. State of Kansas*, 751 F. Supp. 197, 199 (D. Kan. 1990). While the Michigan Court of Appeals's failure to remand the matter to the trial court may provide a basis for granting an evidentiary hearing in this Court,[9] it did not deprive petitioner of the effective assistance of appellate counsel, the right to meaningful appeal, or any other constitutional right. *See Dowdy v. Sherry*, No. 06-CV-10735, 2008 WL 5188827, at *5 (E.D. Mich. Dec. 10, 2008) (Roberts, J.); *Ezell v. Cason*, No. 1:04-CV-214, 2007 WL 518853, at *7-*8 (W.D. Mich. Feb. 14, 2007); *May v. Renico*, No. 00-10420-BC, 2002 WL 31748845, at *4 (E.D. Mich. Nov. 12, 2002) (Lawson, J.). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### b. Failure to Raise Claims on Appeal (Claim XI)

Finally, petitioner contends that appellate counsel was ineffective for failing to raise his sixth through tenth habeas claims on direct appeal. In the appellate counsel context, a showing of prejudice requires a showing that petitioner's claims would have succeeded on appeal. *See Smith v. Robbins*, 528 U.S. 259, 285-86 (2000); *McCleese v. United States*, 75 F.3d 1174, 1180 (7th Cir. 1996). As

---

[9]Petitioner's motion for an evidentiary hearing is addressed in a separate Order filed on this date.

explained above, petitioner's habeas claims are without merit, and thus petitioner cannot show that counsel was ineffective for failing to raise them on direct appeal.

I.      *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law.  Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.

III.     NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

                                        s/Paul J. Komives
                                        PAUL J. KOMIVES
                                        UNITED STATES MAGISTRATE JUDGE

Dated: July 24, 2009

> The undersigned certifies that a copy of the foregoing
> order was served on the attorneys of record   by
> electronic means or U.S. Mail on July 24, 2009.
>
>                    s/Eddrey Butts
>                    Case Manager